

IN THE
TENTH COURT OF APPEALS

No. 10-16-00234-CV

IN THE INTEREST OF J.N., M.N., AND M.N., CHILDREN

From the 249th District Court
Johnson County, Texas
Trial Court No. DC-D201500101

## MEMORANDUM OPINION

The trial court terminated the parental rights of Appellant, the father of J.N., M.N., and M.N., after a bench trial.[1]  The trial court found that Appellant had violated Family Code subsections 161.001(b)(1)(D), (E), and (L) and that termination was in the children's best interest.  Appellant appeals in ten issues.  We will affirm.

### Sufficiency of the Evidence

In his first eight issues, Appellant contends that the evidence is legally and factually insufficient to support the trial court's findings that he violated Family Code

---

[1] The parental rights of the children's mother were also terminated, but she has not appealed.

subsections 161.001(b)(1)(D), (E), and (L) and that termination was in the children's best interest.

In a proceeding to terminate the parent-child relationship brought under section 161.001, the Department must establish by clear and convincing evidence two elements: (1) one or more acts or omissions enumerated under subsection (b)(1) of section 161.001, termed a predicate violation; *and* (2) that termination is in the best interest of the child. TEX. FAM. CODE ANN. § 161.001(b)(1), (2) (West Supp. 2016); *Swate v. Swate*, 72 S.W.3d 763, 766 (Tex. App.—Waco 2002, pet. denied). The factfinder must find that both elements are established by clear and convincing evidence, and proof of one element does not relieve the petitioner of the burden of proving the other. *Holley v. Adams*, 544 S.W.2d 367, 370 (Tex. 1976); *Swate*, 72 S.W.3d at 766. "Clear and convincing evidence" is defined as "that measure or degree of proof which will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *In re G.M.*, 596 S.W.2d 846, 847 (Tex. 1980).

Both legal and factual sufficiency reviews in termination cases must take into consideration whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the matter on which the petitioner bears the burden of proof. *In re J.F.C.*, 96 S.W.3d 256, 264-68 (Tex. 2002) (discussing legal sufficiency review); *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002) (discussing factual sufficiency review).

> In a legal sufficiency review, a court should look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. To give appropriate deference to the factfinder's conclusions and the role of a court conducting a legal sufficiency review, looking at the evidence

in the light most favorable to the judgment means that a reviewing court must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so. A corollary to this requirement is that a court should disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible.

*J.F.C.*, 96 S.W.3d at 266.

In a factual sufficiency review, a court of appeals must give due consideration to evidence that the factfinder could reasonably have found to be clear and convincing. *Id.*

[T]he inquiry must be "whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the State's allegations." A court of appeals should consider whether disputed evidence is such that a reasonable factfinder could not have resolved that disputed evidence in favor of its finding. If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient.

*Id.* (footnotes and citations omitted); *see C.H.*, 89 S.W.2d at 25.

*Evidence Presented at Trial*

CPS investigator James Rost testified that the Department initially received a call involving Appellant on or about January 21, 2015. The concern at that time was that M.N. and M.N., twin boys who were about four months old, were being medically neglected.[2] The twins had been born four weeks prematurely. Around October 2014, they were taken to the emergency room. M.N. had a severe fever and bronchiolitis and needed urgent care. Follow-up care was necessary but was not obtained. The children were not taken to the doctor again until January 21, 2015. At that time, M.N. was so severely ill that the

---

[2] Because the twins have the same initials, we will hereinafter refer to one of them as M.N. and the other as N.M. to distinguish between the two in this opinion.

doctor insisted that he be rushed to the emergency room at Cook Children's Hospital in Fort Worth.

Rost testified that he arrived at Cook Children's Hospital on the morning of February 7, 2015, because there were additional concerns that the children were being abused or neglected. Appellant had called 911 on February 6, 2015, because one of the children was choking. When EMS arrived, M.N. was unresponsive and was rushed to Cook Children's Hospital. It was discovered at that time that both M.N. and N.M. had brain hemorrhaging related to head trauma. N.M. was responsive, but M.N. was completely unresponsive and near death. M.N. was having seizures and had had brain strokes over nearly one hundred percent of his brain. M.N. had to be put in isolation, intubated, and placed in a neck brace. Rost also had to consent to multiple procedures to remove bleeding and fluid off of M.N.'s brain.

Rost stated that the hospital did full skeletal X-rays of the children and that the children did not have any fractures, including skull fractures, which meant that the injuries were from abusive head trauma. Hospital staff informed Rost that M.N.'s injuries were not the result of a single incident. Although the hospital staff could not age the injuries, they knew that the brain hemorrhaging and strokes had definitely occurred multiple times—"upwards of close to 50 times." Rost stated that the person who caused the injuries would have had to have been someone with frequent regular contact with the children because of the multiple incidents of trauma.

Rost testified that he spent the initial weekend communicating with the hospital staff about M.N.'s and N.M.'s care and assisting with the placement of K.V.[3] and J.N. into a foster home. Rost had no other involvement with Appellant or the children once the case transitioned out of the investigatory stage. He stated that he did not know M.N.'s current condition but that it was his understanding that M.N. would have a lifetime of permanent injuries and brain damage.

Rost testified that law enforcement became involved in the case and investigated whether Appellant caused the injuries. K.V., whom Rost believed was five years old at the time, was interviewed and stated that he had seen Appellant shake M.N. violently at one time. Appellant, on the other hand, blamed the injuries on other people that were caregivers of the children for short periods of time. Appellant also blamed some of the incidents on sixteen-month-old J.N. throwing things at the twins. Rost stated that Appellant did not provide an adequate explanation for what had caused the severity of M.N.'s injuries. Rost acknowledged during cross-examination, however, that he had no proof that Appellant actually committed the acts.

Rost testified that he would have concerns if the children were returned to Appellant. It was his concern, based on M.N.'s and N.M.'s condition in the hospital, that Appellant knowingly placed or allowed the children to remain in conditions or surroundings that endangered their physical or emotional well-being. He also believed, based on K.V.'s statement, that Appellant engaged in conduct or knowingly left the

---

[3] K.V. is the children's mother's son from a previous relationship.

children with persons who engaged in conduct that endangered their physical or emotional well-being.

Johnson County Sheriff's Office Detective Leona Yocham testified that she had been assigned to M.N.'s case. During her investigation, she discovered that Appellant's wife, the children's mother, worked outside the home and that Appellant was the primary caregiver of the children. Although there were other people that had contact with the children, Appellant was the one alone with M.N. when the older and newer injuries were inflicted. Yocham stated that she was very confident that Appellant inflicted the injuries to M.N. and that he did it intentionally.

Yocham testified that she presented an injury-to-a-child case against Appellant to the District Attorney's office because she believed that there was enough evidence to prove that Appellant was responsible for M.N.'s injuries. The District Attorney's office proceeded against Appellant for injury to a child. The offense falls under section 22.04 of the Penal Code, entitled "Injury to a Child, Elderly Individual, or Disabled Individual."

Yocham stated that she testified at Appellant's criminal trial and was able to prove up certain "jail house phone call recordings." The voices on the recordings were those of Appellant, his wife, and his mother, who was deceased at the time of trial. The recordings of the phone calls were admitted into evidence. During one of the calls, Appellant stated that he shook the babies while playing and then once "intently." During another call, Appellant acknowledged that he caused M.N.'s injuries. During yet another call, Appellant stated that he shook M.N. twice, once in the past and once on the day that M.N. had the seizure. When asked during the call how many times he shook M.N. on the day

that M.N. had the seizure, Appellant stated that he shook him once or twice; he was not sure. A jury found Appellant guilty of the offense of injury to a child and assessed his punishment at seventy-five years' imprisonment and a $10,000 fine. The judgment of conviction was admitted into evidence.

Yocham testified that it was her opinion that Appellant endangered M.N. She also stated that, because of Appellant's actions, placing or allowing the children to be in Appellant's care would "[m]ost definitely" rise to the level of knowingly placing or knowingly allowing the children to remain in endangering conditions or surroundings. Yocham felt that Appellant would be a danger to the children if he had access to or possession of them in the future.

Texas Department of Family and Protective Services representative Shawn Anderson testified that there had been a time during the pendency of the case that Appellant was out on bond. A service plan was prepared for him, and he completed the majority of his services. He completed parenting classes and a psychological; he did individual counseling and was showing that he had a home for the children. Appellant's completion of his service plan, however, did not lead to a recommendation from the Department that he be allowed access to the children. Instead, the Department was requesting that the trial court terminate Appellant's parental rights to J.N., M.N., and N.M.

Anderson testified that, at the time of trial, Appellant had been convicted of the criminal offense of injury to a child. She believed that Appellant intentionally injured the children, and she would have serious concerns if the children were allowed to return to

his care. No professional recommended a return of the children to Appellant's care. Anderson stated that the Department believed that termination of Appellant's parental rights to J.N., M.N., and N.M. was in the children's best interest. At the time of trial, Appellant was incarcerated in the Johnson County jail. The Department is not capable of placing children in the prison system; it would be contrary to a child's welfare and best interest, and it would be hard for the children's needs to be met. If Appellant's parental rights were terminated, the children would become available for adoption.

Anderson testified that M.N. was "doing well" and had made what had been described as "a miracle recovery." M.N. was two years old at the time of trial but was on a three-month to six-month level developmentally. He was "making progress." He had had eye surgery and could see. He could hear. He was able to hold his bottle and could "sit a little bit by himself." Nevertheless, both M.N. and N.M. had many medical appointments.

Anderson stated that she believed the needs of the children were currently being met to their best interest. M.N. and N.M. had been placed together in a home that was meeting all of their needs. J.N. was in a different foster home but had regular contact with M.N. and N.M., and the brothers were bonded to one another. J.N., M.N., and N.M. also had contact with recently born twins that were the subject of another case. All of the foster parents had created a bond with one another and would get together for family visitations.

Anderson testified that J.N.'s foster mother was interested in adopting him. The Department was currently looking for an adoptive family for M.N. and N.M., and some

people had been interested. The Department did have a mediated settlement agreement with the children's mother that gave her ninety days to provide the name of any individual that might be a suitable placement option for the children. Appellant had provided the name of his grandmother as a possible placement; however, the Department policy was not to place children in the care of someone who had a previous CPS history with a "reason to believe." Even though it was at least ten years old, Appellant's grandmother had had a "reason to believe" for a CPS child abuse case. The Department was also still waiting on the ninety-day window for relatives, but no suitable relatives had come forward for the children.

L.N., Appellant's grandmother, testified that she was seventy-one years old at the time of trial. She stated that Appellant had always been a "good dad" to the children. Before the children's removal, Appellant took care of the children. He changed their diapers, fed them, clothed them, played with them, and loved them. She never witnessed Appellant injure the children. She believed the jury in Appellant's criminal trial got it wrong. She stated that M.N.'s medical records showed that he suffered from a disorder that caused seizures and brain bleeds. When asked if she was aware that Appellant admitted to injuring his children, L.N. said that Appellant's statements were taken out of context.

L.N. testified that Appellant would not be a good placement option for the children because he was going to prison. L.N. wanted the trial court to order the Department to consider her as a familial placement for the children. She stated that she loves the children and is prepared to be physically, emotionally, and mentally capable of

caring for them. L.N. explained that the "reason to believe" occurred many years ago. The Department had removed Appellant from his mother's care. Appellant's mother then went to jail and totally changed her life. L.N. subsequently let Appellant go over to where his mother lived. The "reason to believe" occurred because the Department believed that L.N. had given Appellant back to his mother when she should not have.

### Statutory Predicate Grounds

In his first four issues, Appellant contends that the evidence is legally and factually insufficient to establish that he violated Family Code subsections 161.001(b)(1)(D) and (E).

Termination under subsection 161.001(b)(1)(D) requires clear and convincing evidence that the parent has "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child." TEX. FAM. CODE ANN. § 161.001(b)(1)(D). Termination under subsection 161.001(b)(1)(E) requires clear and convincing evidence that the parent has "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." *Id.* § 161.001(b)(1)(E).

To endanger means to expose to loss or injury, to jeopardize. *Tex. Dep't Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *see also In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996). The specific danger to a child's physical or emotional well-being need not be established as an independent proposition, but it may be inferred from parental misconduct. *See Boyd*, 727 S.W.2d at 533.

. . . When termination of parental rights is based on section D, the endangerment analysis focuses on the evidence of the child's physical environment, although the environment produced by the conduct of the parents bears on the determination of whether the child's surroundings threaten his well-being. *In re S.M.L.*, 171 S.W.3d 472, 477 (Tex. App.—Houston [14th Dist.] 2005, no pet.). Section D permits termination if the petitioner proves parental conduct caused a child to be placed or remain in an endangering environment. *In re R.D.*, 955 S.W.2d 364, 367 (Tex. App.—San Antonio 1997, pet. denied).

It is not necessary that the parent's conduct be directed towards the child or that the child actually be injured; rather, a child is endangered when the environment creates a potential for danger which the parent is aware of but disregards. *In re S.M.L.*, 171 S.W.3d at 477. Conduct that demonstrates awareness of an endangering environment is sufficient to show endangerment. *Id.* (citing *In re Tidwell*, 35 S.W.3d 115, 119-20 (Tex. App.—Texarkana 2000, no pet.) ("[I]t is not necessary for [the mother] to have had certain knowledge that one of the [sexual molestation] offenses actually occurred; it is sufficient that she was aware of the potential for danger to the children and disregarded that risk by … leaving the children in that environment.")). In considering whether to terminate parental rights, the court may look at parental conduct both before and after the birth of the child. *Avery v. State*, 963 S.W.2d 550, 553 (Tex. App.—Houston [1st Dist.] 1997, no pet.). Section D permits termination based upon only a single act or omission. *In re R.D.*, 955 S.W.2d at 367.

*Jordan v. Dossey*, 325 S.W.3d 700, 721 (Tex. App.—Houston [1st Dist.] 2010, pet. denied).

Under subsection 161.001(b)(1)(E), the relevant inquiry is whether evidence exists that the endangerment of the child's well-being was the direct result of the parent's or another's conduct, including acts, omissions, or failures to act. *In re K.A.S.*, 131 S.W.3d 215, 222 (Tex. App.—Fort Worth 2004, pet. denied); *Dupree v. Tex. Dep't of Prot. & Reg. Servs.*, 907 S.W.2d 81, 83-84 (Tex. App.—Dallas 1995, no writ).

Additionally, termination under subsection (E) must be based on more than a single act or omission; the statute requires a voluntary, deliberate, and conscious course of conduct by the parent. [*In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.)]; *see* Tex. Fam. Code Ann. § 161.001[(b)](1)(E). It is not necessary, however, that the parent's conduct be

> directed at the child or that the child actually suffer injury. *Boyd*, 727 S.W.2d at 533; *J.T.G.*, 121 S.W.3d at 125. The specific danger to the child's well-being may be inferred from parental misconduct standing alone. *Boyd*, 727 S.W.2d at 533; *In re R.W.*, 129 S.W.3d 732, 738 (Tex. App.—Fort Worth 2004, pet. denied).

*In re T.T.F.*, 331 S.W.3d 461, 483 (Tex. App.—Fort Worth 2010, no pet.).

Domestic violence, want of self-control, and propensity for violence may be considered as evidence of endangerment. *See In re B.J.B.*, 546 S.W.2d 674, 677 (Tex. Civ. App.—Texarkana 1977, writ ref'd n.r.e.); *see also Sylvia M. v. Dallas County Child Welfare Unit*, 771 S.W.2d 198, 201-04 (Tex. App.—Dallas 1989, no writ) (considering "volatile and chaotic" marriage, altercation during pregnancy, and mother's repeated reconciliation with abusive spouse). Abusive or violent conduct by a parent or other resident of a child's home may produce an environment that endangers the physical or emotional well-being of a child. *K.A.S.*, 131 S.W.3d at 222; *see Ziegler v. Tarrant County Child Welfare Unit*, 680 S.W.2d 674, 678 (Tex. App.—Fort Worth 1984, writ ref'd n.r.e.) (violent or abusive conduct by someone within household is environment that endangers children).

Appellant asserts that the Department's evidence demonstrating the endangerment to the children's physical or emotional well-being centered entirely on M.N. and N.M. having medical problems and injuries that resulted from Appellant's conduct. Appellant argues that the Department, however, failed to prove that the injuries were the direct result of his conduct. Appellant asserts that the record does not include any indication that the Department investigated any other individuals who were around the children near the time of injury. Appellant argues that, instead, the Department simply let the trial court know that certain things took place in his criminal trial.

Appellant also complains that the Department did not have a doctor, nurse, or any medical professional testify at the trial to provide an expert opinion as to any testing, diagnoses, or changes in the condition of the children that would prove he caused an injury that endangered the children.

We believe, however, that the evidence establishes that Appellant caused M.N.'s and N.M.'s injuries. K.V. stated that he witnessed Appellant shake M.N. violently. Appellant himself admitted in the jail phone calls that he shook M.N. and N.M. intentionally and caused M.N.'s injuries. Appellant admitted in one of the calls that the shaking of M.N. was not a single incident; he stated that he shook M.N. on more than one occasion and that he shook M.N. on the day that he called 911 when M.N. became unresponsive. Furthermore, the evidence reveals that the medical personnel found injuries consistent with Appellant's admissions. Although no medical personnel testified, Rost testified that the hospital staff discovered that both M.N. and N.M. had bleeding to the brain as a result of trauma to their heads. Rost also testified that hospital staff informed him that M.N.'s injuries were not the result of a single incident. And Appellant made no objection at trial to this testimony.

Considering all the evidence in the light most favorable to the trial court's findings, we therefore conclude that a reasonable trier of fact could have formed a firm belief or conviction that Appellant knowingly placed or knowingly allowed the children to remain in conditions or surroundings that endangered their physical or emotional well-being and that Appellant engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered their physical or emotional well-being. We

hold that the evidence is legally sufficient to establish that Appellant violated Family Code subsections 161.001(b)(1)(D) and (E).

Considering the evidence as a whole, we conclude that a factfinder could have reasonably formed a firm belief or conviction that Appellant knowingly placed or knowingly allowed the children to remain in conditions or surroundings that endangered their physical or emotional well-being and that Appellant engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered their physical or emotional well-being. We therefore hold that the evidence is factually sufficient to establish that Appellant violated Family Code subsections 161.001(b)(1)(D) and (E). We thus overrule Appellant's first four issues.

In his fifth and sixth issues, Appellant contends that the evidence is legally and factually insufficient to establish that he violated Family Code subsection 161.001(b)(1)(L). Having overruled Appellant's first four issues, however, we need not reach Appellant's fifth and sixth issues. If multiple predicate violations under subsection 161.001(b)(1) were found in the trial court, we will affirm based on any one ground because only one predicate violation under subsection 161.001(b)(1) is necessary to a termination judgment. *In re T.N.F.*, 205 S.W.3d 625, 629 (Tex. App.—Waco 2006, pet. denied), *overruled in part on other grounds by In re A.M.*, 385 S.W.3d 74, 79 (Tex. App.—Waco 2012, pet. denied).

### Best Interest of the Children

In his seventh and eighth issues, Appellant contends that the evidence is legally and factually insufficient to establish that termination was in the children's best interest.

In determining the best interest of a child, a number of factors have been considered, including (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals; (6) the plans for the child by these individuals; (7) the stability of the home; (8) the acts or omissions of the parent that may indicate the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Holley*, 544 S.W.2d at 371-72. This list is not exhaustive, but simply indicates factors that have been or could be pertinent. *Id.* at 372. The *Holley* factors focus on the best interest of the child, not the best interest of the parent. *Dupree*, 907 S.W.2d at 86. The goal of establishing a stable, permanent home for a child is a compelling state interest. *Id.* at 87. The need for permanence is a paramount consideration for a child's present and future physical and emotional needs. *In re S.H.A.*, 728 S.W.2d 73, 92 (Tex. App.—Dallas 1987, writ ref'd n.r.e.) (en banc).

*The Desires of the Children*—J.N., M.N., and N.M. were too young to express their desires.

*The Emotional and Physical Needs of the Children Now and in the Future and the Emotional and Physical Danger to the Children Now and in the Future*—Evidence of past misconduct or neglect can be used to measure a parent's future conduct. *See Williams v. Williams*, 150 S.W.3d 436, 451 (Tex. App.—Austin 2004, pet. denied); *Ray v. Burns*, 832 S.W.2d 431, 435 (Tex. App.—Waco 1992, no writ) ("Past is often prologue."); *see also In re V.A.*, No. 13-06-00237-CV, 2007 WL 293023, at *5-6 (Tex. App.—Corpus Christi Feb. 1,

2007, no pet.) (mem. op.) (considering parent's past history of unstable housing, unstable employment, unstable relationships, and drug usage). Often, the best interest of the child is infused with the statutory offensive behavior. *In re W.E.C.*, 110 S.W.3d 231, 240 (Tex. App.—Fort Worth 2003, no pet.). Particularly when the evidence shows that the parental relationship endangered the child's physical or emotional well-being, evidence of the parental misconduct leading to the removal and subsequent termination should be considered when reviewing the best interest of the child. *In re C.C.*, No. 13-07-00541-CV, 2009 WL 866822, at *10 (Tex. App.—Corpus Christi Apr. 2, 2009, pet. denied) (mem. op.). A parent's history, admissions, drug abuse, and inability to maintain a lifestyle free from arrests and incarcerations are relevant to the best-interest determination. *In re D.M.*, 58 S.W.3d 801, 814 (Tex. App.—Fort Worth 2001, no pet.). A parent's engaging in criminal conduct endangers the emotional well-being of a child because of the parent's resulting incarceration. *See Karl v. Tex. Dep't Prot. & Reg. Servs.*, No. 03-03-00655-CV, 2004 WL 1573162, at *3-4 (Tex. App.—Austin Jul. 15, 2004, no pet.) (mem. op.); *see also R.W.*, 129 S.W.3d at 739 ("[C]onduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child.").

We have already held above that the evidence is legally and factually sufficient to establish that Appellant knowingly placed or knowingly allowed the children to remain in conditions or surroundings that endanger their physical or emotional well-being and that Appellant engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered the children's physical or emotional well-being. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E). Appellant reiterates his arguments that the

Department did not investigate the other individuals that had access to the children and did not offer testimony during the trial from a medical professional regarding the nature of the children's injuries. However, as explained above, we believe that the evidence establishes that Appellant caused M.N.'s and N.M.'s injuries. This evidence of Appellant's endangering conduct supports an inference that because of his past actions, Appellant's future conduct will continue to pose a danger to the children's physical and emotional well-being. *See, e.g., In re Z.I.A.R.*, No. 10-16-00039-CV, 2016 WL 4150691, at *5 (Tex. App.—Waco Aug. 3, 2016, no pet.) (mem. op.).

Furthermore, Appellant's incarceration makes his future uncertain and is relevant to his ability to meet the children's present and future physical and emotional needs. *In re M.D.S.*, 1 S.W.3d 190, 200 (Tex. App.—Amarillo 1999, no pet.). Appellant was incarcerated at the time of trial and has been sentenced to seventy-five years' imprisonment for his conviction for the offense of injury to a child. On the other hand, Anderson testified that she believed that the needs of the children were currently being met to their best interest, including the taking of M.N. and N.M. to their many medical appointments.

*The Parental Abilities of the Individuals Seeking Custody and the Programs Available to Assist These Individuals*—L.N. testified that, before the children's removal, Appellant took care of the children and was a "good dad." Appellant changed the children's diapers, fed them, clothed them, played with them, and loved them. While Appellant was out on bond during the pendency of this case, he also completed the majority of his service plan,

which included completing parenting classes and a psychological, participating in individual counseling, and showing that he had a home for the children.

On the other hand, in reviewing the parental abilities of a parent, a factfinder can consider the parent's past neglect or past inability to meet the physical and emotional needs of their children. *See D.O. v. Tex. Dep't of Human Servs.*, 851 S.W.2d 351, 356 (Tex. App.—Austin 1993, no writ), *disapproved of on other grounds by J.F.C.*, 96 S.W.3d at 267 & n.39. Therefore, in determining that Appellant has poor parenting abilities, the trial court could have considered the evidence that Appellant was the primary caregiver of the children and that Appellant caused M.N.'s and N.M.'s injuries while they were in his care.

*The Plans for the Children by the Individuals or by the Agency Seeking Custody and the Stability of the Home or Proposed Placement*—The factfinder may compare the parent's and the Department's plans for the children and consider whether the plan and expectations of each party are realistic or weak and ill-defined. *In re J.D.*, 436 S.W.3d 105, 119-20 (Tex. App.—Houston [14th Dist.] 2014, no pet.).

A parent's failure to show that he or she is stable enough to parent children for any prolonged period entitles the factfinder "to determine that this pattern would likely continue and that permanency could only be achieved through termination and adoption." *In re B.S.W.*, No. 14-04-00496-CV, 2004 WL 2964015, at *9 (Tex. App.—Houston [14th Dist.] Dec. 23, 2004, no pet.) (mem. op.). A factfinder may also consider the consequences of its failure to terminate parental rights and that the best interest of the children may be served by termination so that adoption may occur rather than the

temporary foster-care arrangement that would result if termination did not occur. *D.O.*, 851 S.W.2d at 358. The goal of establishing a stable, permanent home for children is a compelling state interest. *Dupree*, 907 S.W.2d at 87.

The Department's plan for the children at trial was termination of parental rights and adoption. Anderson testified that J.N.'s foster mother was interested in adopting him. The Department was currently looking for an adoptive family for M.N. and N.M., and some people had been interested.

There is no evidence in the record of Appellant's plan if the children were returned to his care. Appellant has been sentenced to seventy-five years' imprisonment for his conviction for the offense of injury to a child. L.N. testified that she wanted the trial court to order the Department to consider her as a familial placement for the children. But the Department has found that she is not a suitable placement because of her history with the Department.

*Acts or Omissions of the Parent that May Indicate the Existing Parent-Child Relationship Is Not a Proper One and Any Excuse for the Acts or Omissions of the Parent*—The evidence discussed above indicates that Appellant's relationship with the children is not a proper one, and Appellant has not offered any excuses for his acts or omissions on appeal.

Considering all the evidence in relation to the *Holley* factors in the light most favorable to the trial court's best-interest finding, we hold that a reasonable factfinder could have formed a firm belief or conviction that termination of Appellant's parental rights was in the children's best interest. Viewing all the evidence in relation to the *Holley* factors, we hold that a reasonable factfinder could have reasonably formed a firm belief

or conviction that termination was in the children's best interest. The evidence is therefore legally and factually sufficient to establish that termination was in the children's best interest. We overrule Appellant's seventh and eighth issues.

**Hearsay Testimony**

In his ninth issue, Appellant contends that the trial court erred in admitting Rost's testimony that K.V. had said that he had seen Appellant "shake" M.N. Appellant argues that the testimony was hearsay that was unduly prejudicial and prevented him from exercising his right to cross-examination the actual witness.

A party must timely object in the trial court to preserve a complaint for appellate review. TEX. R. APP. P. 33.1(a); TEX. R. EVID. 103(a)(1). Appellant made no objection in the trial court to Rost's testimony that K.V. had said that he had seen Appellant "shake" M.N. Appellant's complaint is therefore not preserved for appellate review. Appellant's ninth issue is overruled.

**Audio Recordings and Appealed Conviction**

In his tenth issue, Appellant first contends that the trial court abused its discretion and/or violated his due process rights by admitting into evidence and considering the audio recordings of Appellant's jail phone calls because they contained an ineffective warning system. The recording stated: "This call is from a corrections facility and is subject to monitoring and recording." Appellant argues that there should have been a *Miranda* warning at the beginning of the recorded conversations. We assume without deciding that Appellant's complaint is preserved for review.

The need for *Miranda* warnings arises when a person has been subjected to a custodial interrogation. *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966). Custodial interrogation is questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way. *Id.* The audio recordings here do not involve any questioning of Appellant by law enforcement officers. Appellant was speaking to his wife and his mother. Appellant states that he was subjected to the "functional equivalent" of interrogation "due to the psychological pressures of being held in jail and accused of a serious crime." Appellant, however, cites no authority to support this proposition.

We conclude that the need for *Miranda* warnings at the beginning of the recorded conversations did not arise because Appellant was not being subjected to a custodial interrogation. Therefore, the trial court did not err in admitting into evidence and considering the audio recordings of Appellant's jail phone calls.

Appellant also contends in this issue that the trial court abused its discretion and/or violated his due process rights by considering a criminal conviction that had been appealed. Appellant argues that the trial court abused its discretion both in admitting the objected-to records into evidence and in relying on subsection 161.001(b)(1)(L) as one of the grounds on which to terminate his parental rights.

First, as stated above, only one predicate violation under subsection 161.001(b)(1) is necessary to a termination judgment. *T.N.F.*, 205 S.W.3d at 629. And we have held that the evidence is legally and factually sufficient to establish that Appellant violated Family

Code subsections 161.001(b)(1)(D) and (E). Second, several courts have concluded that convictions constituting grounds for termination under section 161.001 need not be final. *See In re L.B.*, No. 05-13-01615-CV, 2014 WL 1102050, at *7 (Tex. App.—Dallas Mar. 20, 2014, no pet.) (mem. op.) (citing *Rian v. Tex. Dep't of Family & Prot. Servs.*, No. 03-08-00155-CV, 2009 WL 2341868, at *2 (Tex. App.—Austin Jul. 31, 2009, pet. denied) (mem. op.)); *In re W.B.W.*, No. 11-11-00269-CV, 2012 WL 2856067, at *14 (Tex. App.—Eastland Jul. 12, 2012, pet. denied) (mem. op.); *In re T.C.C.H.*, No. 07-11-00179-CV, 2011 WL 6757409, at *9 (Tex. App.—Amarillo Dec. 22, 2011, no pet.) (mem. op.). We therefore overrule Appellant's tenth issue.

## Conclusion

Having overruled all of Appellant's issues, we affirm the trial court's order of termination.


REX D. DAVIS
Justice

Before Chief Justice Gray,
      Justice Davis, and
      Justice Scoggins
Affirmed
Opinion delivered and filed February 22, 2017
[CV06]



In re J.N.